[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is a Memorandum of Decision after a contested dissolution trial. This court, after hearing testimony, reviewing the evidence and considering the claims of law and fact, finds as follows:
The plaintiff wife and the defendant husband were married in Norwalk, Connecticut on October 3, 1970. A child was born, issue of the marriage, who is now 27. Both parties have satisfied the residency requirements. Neither party has received assistance from the state of Connecticut. The evidence clearly indicates that the marriage of the parties has irretrievably broken down. CT Page 10412
The plaintiff wife is 50 and in good health. She attended Norwalk High School and received training in secretarial skills from Lee-Johnson School of Business in Norwalk. This is her second marriage. Her first marriage lasted less than a year. She had no children from her first marriage.
The plaintiff has always been employed in various capacities since leaving high school. At the time of the marriage in 1970, she was employed as a secretary in the Cardiology Department of Norwalk Hospital. She had no assets and had debts of approximately $1,000. She started working at Norwalk Hospital in 1968 and left just prior to the birth of the parties' only child. The parties then agreed that she would stay home and raise their son. For the next five years the plaintiff did not seek employment. Her first job thereafter was a part-time evening clerical position with the Norwalk Police Department.
Her sister-in-law, her husband's sister, is married to Stew Leonard, Sr. In the early 1980's she worked part-time at Stew Leonard's retail store setting up the Credit Department. She was paid $5.00 an hour and worked approximately 5 hours a day. Her work hours enabled her to drop off and pick up her son from school. By the mid 1980's she was working full-time for Stew Leonard's in an administrative capacity. Her duties changed over the years and eventually she became the secretary for the management of Stew Leonard's. In 1993 she worked a 40 hour week and was paid $6.00 to $7.00 per hour. She left this job in October, 1993. She was terminated because of her involvement in the Internal Revenue Service's investigation of the store. As a result of that investigation, three Stew Leonard employees were arrested: Stew Leonard, Sr., Frank Guthman (the defendant), and her husband's brother, Steven Guthman. All three pleaded guilty and were sentenced to prison. Her current employment will be discussed later.
The defendant husband is 56 and in good health. He is a high school graduate and started his working career at Clover Farms which was the Leonard family dairy. He worked six plus years as a milkman. At the time of the marriage he was a patrolman for the Norwalk Police Department and was working part-time for Stew Leonard's. At that time he owned the current marital home at 35 Riverview Drive, Norwalk CT. He purchased it in his own name a month before the marriage for $33,500 subject to a $25,000 first mortgage. He owned furniture, a boat, an automobile and owed $1,200 in bills. He had no pension rights with either employment. CT Page 10413 He had no other significant assets at the time of the marriage. In July, 1973, he left the Norwalk Police Department and became employed full-time at Stew Leonard's. He was in charge of general repairs and helped design exterior and interior additions. He was paid $18,000 a year. Eventually his job changed, and he became Vice President of Operations. The defendant described the nature of this job as follows: "It entailed everything. I literally ran the store. I was in charge of the store. I worked very hard. I was in charge of maintenance." Prior to his termination from Stew Leonard's in October, 1993, the defendant was earning $250,000 per year. This was his highest salary in his twenty years with by the store.
In addition to the in-store duties, the defendant was the general contractor for Stew Leonard, Sr.'s home on the Caribbean island of St. Martin. During the construction of the home he would spend two weeks per month in actual construction work on St. Martin. The defendant was not paid extra for this work.
The defendant was indicted by the Internal Revenue Service on various fraud counts. The plaintiff was never indicted, but she admitted at this dissolution trial that she was an "unindicted co-conspirator." The defendant entered into a plea bargain agreement with the Federal Government. The plea bargain required him to plead guilty to various felony charges. He did. He was sentenced and served three years. He was in prison in Allenwood, Pennsylvania from November, 1993 until July, 1996, and in a halfway house in Hartford, Connecticut from July, 1996 until November, 1996. He was fined and was required to pay the costs of incarceration. The fine and costs of incarceration totaled $152,000. Included in the plea bargain was the government's agreement not to bring any criminal charges against the plaintiff. No such charges were brought.
The plaintiff testified concerning the tax fraud scheme at Stew Leonard's. She claimed that she had nothing to do with this scheme. She states she only became aware of it when, on some of the trips that she took with the defendant to St. Martin, she brought boxes wrapped in baby paper which were to have contained baby gifts. In fact the boxes contained cash. The defendant testified that he told her of this scheme. He stated that the plaintiff was aware that others in Stew Leonard's store had knowledge of this tax avoidance scheme. After further examination on this subject at this trial, the plaintiff admitted that she physically altered deposit slips of Stew Leonard's. The court CT Page 10414 concludes that the plaintiff was in substantial criminal jeopardy as a result of her participation.
The plaintiff admits that she did discuss this scheme with other Stew Leonard's employees prior to the IRS raid. The plaintiff believed that one of the employees of Stew Leonard's was wired to record her. Shortly thereafter, the defendant was indicted by the IRS on October 9, 1991.
Just before the indictment, the Internal Revenue Service raided the Guthman marital home at 35 Riverview Drive. There was a large walk-in safe in the basement. The IRS seized $485,000 cash from this walk-in safe. The IRS, after concluding their investigation, determined that a portion of that $485,000 rightfully belonged to the Guthmans. The sum of $150,000 was returned to the parties which was deposited into a joint Fairfield County Savings Bank account. The IRS had taken all back taxes, penalties and interest from the remaining $335,000 cash. The Guthmans apparently no longer have any further IRS obligations due to the Stew Leonard tax scheme. No other claims, deficiencies or liens have been filed by the IRS for any tax returns filed by the parties. There are no pending audits. Neither party testified as to any audit notice by any taxing authority.
This court concludes that a substantial nonmonetary contribution was made to the marriage by the defendant in his negotiating a plea bargain, entering a guilty plea and serving a period of incarceration so that the plaintiff was not faced with arrest, conviction, incarceration, fine and/or probation. O'Neillv. O'Neill, 13 Conn. App. 300, 311 (1988).
During the first few months of the defendant's incarceration in Allenwood, the plaintiff would visit each week. The round trip took seven hours. In the late spring of 1994, she was employed in the travel business, with a friend, Carol Warren. While attending a travel convention in Chicago in August, 1994, she met Ralph Robertson. They became romantically involved. In October, 1995, she moved to Mr. Robertson's hometown, in Centralia, Missouri. She is currently employed in Ralph Robertson's retail jewelry store in Centralia. The store has two full-time employees, Mr. Robertson and the plaintiff. There are also two part-time employees. The plaintiff earns a $1,300 monthly salary.
The plaintiff purchased a home at 5 Sunrise Circle, CT Page 10415 Centralia, Missouri, for $89,000 using $30,000 of joint marital funds. The remaining purchase price came from the current $59,000 first mortgage. This money was removed from Connecticut without the defendant's knowledge or permission. The defendant was incarcerated at that time. The plaintiff's financial affidavit states that the current fair market value of the Centralia, Missouri house is $89,000. Ralph Robertson paid nothing for the purchase of the Centralia, Missouri house, which is currently owned equally by himself and the plaintiff.
The plaintiff testified about problems during the marriage, a number of which concerned the parties' son. As a result of these problems she claims that the defendant was antagonistic towards the two of them, and this antagonism continued for a long period of time. There were two episodes of physical abuse, one occurred in 1971 to the plaintiff and the second in the mid 1980's to the son. After listening to the evidence, this court concludes that these claims are pretextual and are intended to cover up the plaintiff's fault in causing the breakup of the marriage. The cause of the breakup of the marriage falls exclusively on the shoulders of the plaintiff, who, when faced with the defendant's incarceration, after his plea bargain that saved her from criminal jeopardy and, no doubt incarceration took up with another man. Then without the consent and knowledge of the defendant, she took joint marital funds and left for Missouri where she has now set up another life. Despite the fact that the plaintiff met Mr. Robertson in the summer of 1994, she did not disclose this fact to the defendant, until January of 1995. He was still incarcerated in Allenwood. The defendant pleaded with the plaintiff, "not to see the guy any more." The plaintiff said, "I can't do it. I have fallen in love with him." The court notes that the plaintiff, in her Claims for Relief, is not seeking periodic alimony.
Four years after the indictment and two years after the defendant's plea, the plaintiff decided to file for this dissolution. By the date of this complaint for dissolution, she had purchased the Centralia, Missouri house. In addition, in 1995, she loaned Mr. Robertson $56,000 so he could purchase jewelry inventory at a substantial discount. The promissory note bears interest of 6 3/4%. The $56,000 loan is not secured. No interest or principal has been paid. The $56,000 came from the parties' joint marital funds without the defendant's consent or knowledge. CT Page 10416
By the date of this complaint for dissolution, the plaintiff had already driven a 1989 Corvette automobile to Centralia. The car was registered in the defendant's name. The parties stipulated the Corvette was worth $17,500. The defendant did not consent to this removal and had no knowledge that it had taken place. He was still in prison. The plaintiff signed the defendant's name and conveyed the title to herself, registering the motor vehicle in Missouri. At the same time, she transported to Missouri a Ski Nautique boat with a stipulated value of $6,500, again without the defendant's consent or knowledge. The ski boat is still in Missouri. The plaintiff admits removing other joint property to Missouri which she values in her financial affidavit at just under $4,000. The defendant claims that the plaintiff wrongfully removed more personal property since she hired a 21 foot rental truck for the move.
The plaintiff testified that she received a cash gift of $28,000 from the defendant's father in August, 1987. The defendant's father died in November, 1987. The plaintiff testified that her father-in-law gave her $28,000 cash in a box and told the plaintiff not to tell the defendant. Until this dissolution action was filed, she never disclosed the $28,000 cash gift. It is unknown to the court if any estate taxes were paid or whether this gift, made three months prior to Mr. Guthman Sr.'s death, was ever known to his estate. The defendant testified that he knew nothing about this gift and found it to be strange indeed. This court also finds the plaintiff's testimony as to the source of the $28,000 not credible.
The plaintiff testified that she received a bonus from Stew Leonard and used this bonus plus the $28,000 cash from Mr. Guthman's father plus some other joint funds to loan her parents $120,000. The stated purpose was for her parents to purchase a condominium in Norwalk, Connecticut. This condominium was purchased in the name of a Florida corporation, which was set up by attorneys hired by the plaintiff. The corporation was eventually dissolved and the condominium sold in August, 1997. Her parents are now retired. They are people of modest means and live in Florida. She now claims that she owes her parents $45,000 by reason of the fact that her parents re-loaned that amount back to her. Despite questions from both counsel on the subject of the $120,000 loan, condominium transactions and the $45,000 loan, the plaintiff produced no documentation on any of the three trial days, although this issue was raised on the first trial day. On cross-examination, the plaintiff admitted that the CT Page 10417 $120,000 loan to her parents was made without a promissory note, security agreement, receipts retained, gift taxes paid or gift tax returns filed. This court draws an inference that a majority of said $120,000 came from joint marital funds and was loaned to her parents without the consent or knowledge of the defendant.
During the defendant's incarceration, the plaintiff"loaned" Carol Warren $50,000. Carol Warren is the owner of Warren Travel Group, with whom the plaintiff had been working during the period of the defendant's incarceration prior to her move to Missouri. The funds were taken out of the joint Norwalk Municipal Employee's Credit Union (NMECU) account, without the defendant's knowledge or consent. That $50,000 was not secured. The plaintiff herself has a question as to whether the $50,000 was infusion of capital or an actual loan to the Warren Travel Group. In addition to the $50,000, another $40,000 loan to Carol Warren was made by the plaintiff. Carol Warren is paying off the $40,000 loan on a monthly basis directly to the NMECU. On some occasions, the payments by Carol Warren have been late. As of April 30, 1998, the loan by NMECU is $26,903.10. The defendant is concerned that the lateness of this loan could affect his credit. None of the $50,000 has been repaid and its status as a loan/investment is still unclear.
Just prior to his 1993 incarceration the defendant executed a full power of attorney naming the plaintiff as his attorney-in-fact. At all times she had possession of the original signed power of attorney. The defendant did not revoke the power of attorney during his three year incarceration. Prison rules prohibited the defendant from having access to his any of his assets during his incarceration.
In 1993, just prior to the defendant's incarceration, the parties had deposited additional funds in the Norwalk Municipal Employee's Credit Union. The account was in the name of"Frank Guthman and Christyne B. Guthman ITF Guthman children, 35 Riverview Drive, Norwalk, CT". The account had an opening balance of $152,000. The majority of this money came from an inheritance from the defendant's uncle, Ernest Guthman. It was not clear how this account was established. There are no trust documents. Efforts were made to structure the funds to avoid gift taxes. The parties were at all times joint signatories as "trustees". Without the consent and knowledge of the defendant, the plaintiff used a substantial portion of these "trust" funds in the following manner: (1) $30,000 for the Missouri home, (2) $15,000 for their son's attorney's fees, (3) $6,000 payment in October, CT Page 10418 1995 to Lori Stanizeski, the defendant's daughter by a prior marriage, (4) $10,000 to the defendant's daughter in February, 1998(5) $2,000 for the defendant's daughter automobile lease down payment, (6) $10,000 for their son's wedding, (7) $3,000 psychic hot line bills incurred by Ralph Robertson's daughter, (8) $5,000 back real estate taxes for 35 Riverview Drive, and (9) $31,000 in attorney's fees for her current dissolution attorney. She still owes $11,000 to her attorney. Since no trust documents were provided, no evidence was furnished as to the execution of the trust documents, the names of the Guthman children were not noted in any document nor identified by any witness in testimony, and the funds were treated by the plaintiff as marital property, this court concludes that there was no trust and all funds in the $152,000 NMECU were marital property.
In October, 1993 just prior to the defendant's incarceration, the defendant provided a financial statement to the Internal Revenue Service. Exhibit 4 was a draft copy of that financial statement prepared by the plaintiff in her own handwriting. Using this exhibit, the defendant urged this court to find that a substantial amount of those assets on hand in October 1993, were taken or spent by the plaintiff without the knowledge or consent of the defendant, during his incarceration. The defendant claims that these removed funds total $321,723. He claims that this $321,723 should be added back as marital assets and then equitably divided. He offered Exhibit 5 to document the $321,723. He urges the court to allocate the cause of the breakup of the marriage directly to the plaintiff and award him the majority of the assets. This issue is the major financial dispute in this case.
The plaintiff claims that she was given inadequate funds to live on in 1994 and 1995. She lived in the marital home at 35 Riverview Drive, Norwalk. The house is 9,000 square feet with an indoor pool. She claims that the maintenance costs were high and she had to invade assets in order to live. During this time she received $1,300 net a month from rental real property owned by the parties at 4 Dry Hill Court, Norwalk, Connecticut. She received $3,300 gross per month from the defendant's pension at Stew Leonard's, netting $2,900. She received some $1,500 over a period of four or five months in late 1993 and early 1994 as unemployment compensation benefits. This amount to slightly over $50,000 per year tax fee. She had no other income in 1994-95. The defendant's financial affidavit shows that the annual expenses for 35 Riverview Drive in 1996 were $16,500. The house was vacant CT Page 10419 through most of 1996. The expenses would have increased when occupied by the plaintiff. This court assumes that the expenses for 1994-95 would be lower due to the cost of living. It appears that the vacancy and cost of living factors balance each other out. Therefore, the court finds $16,500 to $17,000 is a reasonable annual expense for the maintenance of 35 Riverview Drive in 1994 and 1995 when the marital home was occupied by the plaintiff. The court finds that the plaintiff's claim that she had to invade the parties' joint assets to pay for 35 Riverview Drive in 1994-95 is not credible. She had over $50,000 tax free per year to live on. Her annual housing expenses were $16,500 to $17,000. There was no evidence that during 1994-95 the plaintiff paid for any large repairs, maintenance or replacement of the marital home.
The defendant was employed by the Norwalk Police Department from 1967 to 1973. He is not entitled to a pension. He was employed by Clover Farms, now Stew Leonard's, from 1959 through 1993 and is entitled to a pension. The pension is in pay status and has been paid to the defendant by Stew Leonard's since 1993 at the rate of $3,300.00 per month. The pension agreement between the defendant and Stew Leonard's was included in the evidence as Exhibit #1. He was married from 1959 until 1968 and had four children issue of that marriage. In 1963 he purchased property at 35 Ferris Street which was his residence until he sold it in 1968. He then moved into his father's house for a few years. He then purchased 35 Riverview Drive, Norwalk in his own name in the summer of 1970. The down payment for Riverview Drive came from: (1) the sale of 35 Ferris Street and (2) defendant's savings. The defendants contributed substantial labor and funds to improve the marital home.
The assets of the parties as of the fall of 1993, when the defendant was incarcerated, are shown in Exhibit 4. The evidence at trial revealed that Exhibit 4 did not accurately reflect all the assets and in some aspects were internally inconsistent. A close examination of Exhibit 4 and the testimony at trial indicates that the family assets were $1,305,000 in 1993. At that time, the IRS had collected all the back taxes that were due by reason of the tax fraud scheme, and the IRS had returned to the parties the $150,000 remaining from the $485,000 seizure of cash. The parties' October 1993 assets consisted of: (1) Fairfield County Savings Bank, joint account, $46,000, (2) Fairfield County Savings Bank, joint account, $149,000 from the IRS refund, (3) People's Bank, joint account, $1,000, (4) NMECU (Norwalk CT Page 10420 Municipal Employees Credit Union) Money Market Credit Union "in trust for the Guthman children", $139,000, (5) NMECU joint account, $11,000, (6) NMECU joint savings, $26,000, (7) Oppenheimer stock accounts, joint, $192,000(8) vehicles and boats, $83,000, (9) Fairfield County Savings Bank Money Market, account, $3,000, (10) the two mortgage free homes located in Norwalk, $645,000, and (11) jewelry, $10,000. The total was $1,305,000. These numbers have been rounded off for the purpose of this decision. In addition, the defendant had a Stew Leonard's 401k in the amount of $85,000. The $85,000 401k is now listed in the defendant's financial affidavit as a Merrill Lynch IRA with a current value of $139,000. The Stew Leonard's pension is now in pay status and distributes $3,300 per month gross to the defendant. Exhibit 4 does not contain reference to either the 401k or the Stew Leonard's pension.
According to Barry Kaplan, the plaintiff's pension expert, the defendant's pension from Stew Leonard's has a present value of $505,567. To obtain this value Mr. Kaplan used the Pension Benefit Guarantee (PBG) interest rate of 5.6% for the first twenty-five years and a 5.25% rate thereafter. This calculation was based on the defendant's life expectancy, the terms of the pension agreement, and the $3,300 monthly payment. Mr. Kaplan also appraised the same pension as of June 1, 1997. He reported a then present value of $481,298 using the then PBG interest rates of 6.4% and 5% after twenty-five years. The 6.4% rate better reflects the current economic conditions. This court finds that the present value of the Stew Leonard's pension is $481,298.
The defendant is now employed with a son from his prior marriage in a business known as Inside-Outside, Ltd. He is a general contractor. His most recent financial affidavit discloses annual gross earnings from this business of $40,325. This is his only employment. In addition he receives the $3,300 gross, $2,900 net per month from his Stew Leonard's pension. He earns less than $200 per week from dividends and interest. The court is of the opinion that the defendant's financial affidavit reflects his earning capacity. The parties stipulated that the fair market value of the mortgage free single family marital home at 35 Riverview Drive, Norwalk, Connecticut is $489,500. They also stipulated that the mortgage free home rental property at 4 Dry Hill Court, Norwalk, Connecticut has a fair market value of $154,500. The court accepts the $25,000 value of Inside-Outside LLC placed by the defendant in his financial affidavit. CT Page 10421
This court does not feel that a detailed analysis of the plaintiff's expenditures during the defendant's incarceration is necessary for an equitable resolution of the issues in this case. This court does believe that certain sums should be added back as marital property. This adding back would fairly compensate the defendant for the loss of the use of his money when it went to Missouri. The defendant claims the add-back should be $321,723. This court does not believe that such an amount is appropriate.
The defendant has filed a Claim for Relief which the plaintiff classified as penurious, arguing that the defendant's offer is only 22% of the net assets. The defendant counters by noting that when the $321,723 is added back in, the percentage to the plaintiff is much larger. The plaintiff is not requesting alimony. She is asking an equal distribution of the assets based on the 27 year marriage.
The court believe the $321,723 can be accounted for in twelve categories, as follows: (1) $56,000 loan to Ralph Robertson, (2) $30,000 down payment on the Centralia, Missouri house, (3) $50,000 "loan" to Carol Warren, (4) $10,000 to the defendant's daughter in February, 1998, (5) $2,000 for the defendant's daughter's automobile lease down payment, (6) $6,000 paid to the defendant's daughter in October, 1995, (7) $15,000 attorney fees for their son, (8) $10,000 for their son's wedding, (9) $8,500 loss caused by the son's use of a credit card, (10) $120,000 loaned and/or given to the plaintiff's parents, and (11) $14,223 difference attributed to plaintiff's dissolution attorney fees. This totals $321,723. This calculation is not precise, but then again neither was the defendant's evidence to establish the $321,723. Of these twelve categories, the plaintiff has conceded that the following should be considered as current property for equitable distribution purposes and are so set forth in her financial affidavit: (1) $56,000 loan to Ralph Robertson, (2) $30,000 down payment on the Missouri house and (3) $50,000 "loan" to Carol Warren. Items (4) through (9) were family expenses for children and were a benefit to both parties. Item (11) is personal to the plaintiff.
This leaves Item (10), the $120,000 loan and/or gift to the plaintiff's parents. This $120,000 is not accounted for on either parties financial affidavit. Forty-five thousand dollars ($45,000) is claimed by the plaintiff on her financial affidavit as a debt owed to her parents. This $45,000 "loan" was part of the original $120,000. This court concludes that $120,000 should CT Page 10422 be added back in as a marital asset for distribution and credit purposes. The court has carefully considered the findings of fact, claims of law of both parties, the criteria set forth in General Statutes §§ 46b-62, 46b-81 and 46b-82, and O'Neill v.O'Neill, 13 Conn. App. 300 (1988), in reaching the decision, reflected in the orders that follow:
 ORDERS
1. A decree dissolving the marriage will enter
2. Using the plaintiff's statement of assets dated May 14, 1998 as a guideline, the estimated gross assets are $1,884,165; adding back in the "parents loan" of $120,000, the estimated gross assets then total $2,004,165.
3. The plaintiff is awarded the following assets free and clear of any claim by the defendant: [These numbers have been adjusted by findings of value already made by this court earlier in this decision]
 a) Credit for the $120,000 loan and/or gift to her parents including the obligation, if any, to repay any resulting $45,000 loan from her parents.
 b) All right, title and interest in and to the real property at 5 Sunrise Circle, Centralia, Missouri
c) Sturgeon Bank savings account, $500
d) 1989 Corvette automobile, $17,500
e) Loan to Ralph Richardson of $56,000 together with accrued interest
f) Ski Nautique boat and Trailer, $6,500
g) Jewelry, $22,000
h) Ten shares of Warren Travel Group, $10,000
i) Funds loaned to and/or invested in Warren Travel Group, $50,000
j) Checking account, balance $37
 k) Claim against Centralia Missouri insurance policy or policies for $150,000 worth of stolen jewelry CT Page 10423
l) One-half Oppenheimer Growth Fund as of March 31, 1998, $111,102
m) One half Merrill Lynch Trust #877-409 15-1 as of 4/30/98, $31,361
 n) Personal property, furniture, furnishings and bric-a-brac at 5 Sunrise Circle, Centralia, Missouri
o) Oppenheimer IRA, $12,136
p) American Funds IRA, $2,000
q) 1991 Accura Legend automobile.
4. The real property at 4 Dry Hill Court, Norwalk, Connecticut will be sold, and the net proceeds after payment of all closing costs will be distributed as follows: 75% to the plaintiff and 25% to the defendant. Prior to the closing the defendant shall receive all the income from said property, as trustee for both parties, pay the expenses and then remit Seventy-five percent (75%) of the net income to the plaintiff every three months commencing October 1, 1998. The defendant shall submit to the plaintiff, with said quarterly annual payment, a written quarterly annual payment, a written accounting of the income and expenses of said property. The property shall be managed solely by the defendant in order to maximize sale ability and net income.
5. The defendant is awarded the following assets free and clear of any claim by the plaintiff: [These numbers have been adjusted by findings of value already made by this court earlier in this decision]
a) Merrill Lynch IRA, $139,493
b) Oppenheimer growth IRA, $122,637
c) Stew Leonard's pension valued at $481,298 as of June 1, 1998
 d) One-half Merrill Lynch Realty Asset Trust #877-40915-1 as of 4/30/98, $31,361
e) Inside-Outside LLC, book value $25,314
f) 1987 Riva speed boat and 1987 Jet ski
 g) All automobiles, motorcycles and trucks registered in defendant's name and listed on page 6 of defendant's May 12, 1998 financial CT Page 10424 affidavit
 h) Personal property, furniture, furnishings and bric-a-brac at 35 Riverview Drive, Norwalk, Connecticut, subject to the terms and conditions of Paragraph 11 of this Order.
i) One-half Oppenheimer Growth Fund as of March 31, 1998, $111,102
j) Various NMECU accounts, $1,000
 k) Peoples checking and other bank accounts listed in his financial affidavit, $7,000
6. Neither party shall pay alimony to the other.
7. Each party shall pay their own attorney's fees. No add back credit will be given as to the any attorney fees paid by the plaintiff out of the Guthman children's trust fund since the defendant's attorney fees have exceeded that sum.
8. The plaintiff is to pay off and hold the defendant harmless from the NMECU $40,000 loan to Carol Warren. The court will retain continuing jurisdiction to determine the method of payment, if any, by the plaintiff. The defendant shall assign, convey and transfer to plaintiff all right, title and interest in the said $40,000 Carol Warren loan.
9. The defendant is awarded the right, title and interest in and to the real property at 35 Riverview Drive, Norwalk, Connecticut, free and clear of any claims by the plaintiff. Said premises are mortgage free. Immediately upon the execution of the quit claim deed by the plaintiff to the defendant, the defendant shall sign a promissory note to the plaintiff in the amount of $200,000. The note shall bear interest at the annual rate of 7.0%. The note shall be secured by a first mortgage on said premises. The court will retain continuing jurisdiction over the terms and conditions of said note and mortgage. The $200,000 note shall be paid to the plaintiff in the following manner: on July 1, 1999 $10,000 together with accrued interest, and $10,000 on each July 1 thereafter together with accrued interest. The unpaid principal and accrued interest shall be due in full upon the death of the plaintiff, the death of the defendant, the sale, transfer or conveyance of 35 Riverside Drive to any person or entity, whether for valid consideration, gift or for any other purpose or July 12, 2018, whichever shall first occur. The defendant shall pay for and maintain adequate fire and liability insurance on the CT Page 10425 premises and shall provide proof thereof to the plaintiff upon her written request.
10. The court is of the opinion that both parties' benefited from the defendant's plea bargain and both are equitably responsible for the payment of the balance of the $147,806.40 due to the United States Government for the defendant's criminal fine and costs of incarceration. The court, by dividing up the assets, pursuant to this order, has equitably allocated to the plaintiff her share of said $147,806.40 debt. The said debt, therefore, shall be the sole and exclusive obligation of the defendant, and he shall pay and hold the plaintiff harmless therefrom.
11. Each party is claiming extensive personal property now located at 35 Riverview Drive, Norwalk, CT. The said personal property, furniture, furnishings and bric-a-brac listed in Schedule B of the plaintiff's Claims for Relief dated May 11, 1998 and Paragraph IV C of the defendant's Financial Affidavit dated May 12, 1998 will be divided between the parties: Seventy five (75%) percent to the defendant and Twenty five (25%) percent to the plaintiff. Each party will prepare a full and complete list of all items of personal property including serial numbers and other descriptive details, together with a statement of the current fair market value of said item. The lists will not be filed with the court but will be exchanged between the parties. Each party shall permit the other's agent to inspect, photograph, appraise, video and/or catalogue, the personal property in question in the premises where they are located. The lists will exchanged by the parties no later than November 2, 1998. The court will retain continuing jurisdiction concerning all orders relating to the division of personal property.
12. In the event of any deficiency assessment, penalty or interest on any jointly filed federal or state income tax return, the obligation shall be divided equally between the parties. Each party shall notify the other of any such claim and shall cooperate with respect to any such claim.
13. The defendant shall the hold plaintiff harmless from any and all costs, claims, liabilities, demands and fees arising out of the Dodge Caravan automobile lease signed by the plaintiff in January, 1994, which automobile is operated by his the defendant's daughter.
14. As to the assets not yet mentioned in this court order, each party CT Page 10426 will continue to own as their separate property those assets listed in their respective financial affidavits.
15. As to the debts and liabilities not yet mentioned in this court order, each party will pay for and hold the other party harmless from any and all debts and liabilities listed in their respective financial affidavits.
16. The party violating any hold harmless order shall pay to the other party any attorney's fees and costs incurred by that party in enforcing said hold harmless obligation.
17. Each party will sign all documents necessary to put into effect the orders of this court.
18. The plaintiff's attorney will prepare the judgment file for approval and signature by the defendant's attorney.
KEVIN TIERNEY, J.